UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

HAYWOOD JOHNSON and
DORLEEN JOHNSON,

        Plaintiffs,              CASE NO. 05-CV-74465

-vs-                                      PAUL D. BORMAN
                                      UNITED STATES DISTRICT JUDGE

CURT SCHEIDLER, in his individual
capacity,

        Defendant.
_____/

**OPINION AND ORDER**
**(1) GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON**
**PLAINTIFFS' FEDERAL CLAIM;**
**AND (2) DISMISSING WITHOUT PREJUDICE PLAINTIFFS' STATE LAW CLAIMS**

Before the Court is Defendant Curt Scheidler's ("Defendant") February 12, 2007 Motion to Dismiss, or Alternatively, for Summary Judgment. (Docket No. 13). Plaintiffs Haywood ("Plaintiff") and his wife, Dorleen Johnson, filed their Response on March 7, 2007. The Court held a motion hearing on April 4, 2007. Having considered the entire record, and for the reasons that follow, the Court GRANTS Defendant's Motion for Summary Judgment on Plaintiffs' federal claim and DISMISSES WITHOUT PREJUDICE Plaintiffs' state law claims.

**I.     BACKGROUND**

Defendant Curt Scheidler is a Detective in the Genesee Township Police Department. Plaintiff Haywood Johnson was prosecuted by Genesee County; Scheidler was the case agent. Plaintiff's first trial ended in a hung jury, and his second trial ended in an acquittal. This case, which contains, inter alia, a federal civil rights claim under 42 U.S.C. § 1983, arises out of

Plaintiff's allegations that Defendant police officer did not turn over to Plaintiff allegedly exculpatory evidence of gunshot residue swabs of the government's principal witness, for his first criminal trial in state court.

Plaintiff was a resident in Genesee County, Michigan. (Compl. ¶ 1). Defendant was employed as the lead detective for the Genesee Township Police Department. (Compl. ¶ 2).

On August 22, 2004, Roderick Bradshaw was murdered on the property of Martin Darren Newman, on 1090 East Juliah in Genesee Township, Michigan. (Compl. ¶¶ 7-8). Bradshaw's body was found in the bathroom of the residence by Gana Green, who lived at that address with Newman. (Def. Br. Ex. B, Green Preliminary Exam Testimony, 6-7, 15-18). Green discovered the body after returning home from her mother's house, where she had been eating dinner and had watched the 7:30 p.m. lottery drawing. (*Id*. at 11). Green testified that no one was at Newman's residence when she left for her mother's house at approximately 5:00 p.m. No one was in the house when she returned and found Bradshaw's body. (*Id*. at 10, 21). Green called 911 at 8:09 p.m. (*Id*. at 18); and police officers, including Defendant, were dispatched to that location. (Compl. ¶¶ 9-10). The first officers arrived at 8:11 p.m. (Scheidler Preliminary Exam Testimony 92). Defendant was the lead and most senior detective at the Genesee Township Police Department and was the officer in charge of the detective bureau. (Compl. ¶ 11; Scheidler Preliminary Exam Testimony 85-86).

Defendant became the officer in charge of the investigation into the death of Bradshaw. (Compl. ¶ 12). On the day of the murder, August 22, 2004, Defendant and fellow police officers began interviewing persons in the immediate area and photographed the crime scene. The officers found a .22 caliber rifle at Newman's residence. (Compl. ¶ 13). Based upon the

information obtained on the night of August 22 and morning of August 23, Defendant learned that Newman and Bradshaw had been friends, regularly smoked crack together, that a week earlier Bradshaw and Newman had had a dispute over Bradshaw's "shorting" Newman on a crack purchase, and that Newman and Bradshaw had been together on the day of Bradshaw's murder. (Compl. ¶ 14).

While the police officers were still on the scene, Newman arrived at the 1090 East Juliah residence. (Compl. ¶ 15). Newman was then detained and taken to the police department for questioning. (Compl. ¶ 16). At the station, Newman was read his Miranda rights, waived them, and consented to be interviewed by the police officers without an attorney present. (Compl. ¶ 17). The interview was taped and lasted from about midnight until 1:00 a.m.

During the interview, Newman admitted that he owned the .22 rifle that the police found in his residence, but denied owning any other guns. (Def. Br. Ex. C, Newman Interview, 8). He also stated that a friend had used his .22 caliber rifle the day before the murder to shoot stray cats. (*Id*. at 15). Newman then said that he had picked up the .22 rifle from his friend the day of the murder. (*Id*.). Newman denied shooting Bradshaw. (*Id*. at 17). Newman offered to take the police to recover the .22 rifle, to demonstrate to them that the gun would only fire one shot at a time due to a faulty loading mechanism. (*Id*.).

At about 4:00 a.m. on August 23, Defendant administered a gunshot residue swab of the front and back of Newman's hands. (Compl. ¶ 18). Defendant had obtained the swabbing kit of the Michigan State Police crime scene investigators, while he was still at the 1090 East Juliah residence. (Compl. ¶ 19). Defendant properly collected the residue and filled out the form accompanying the kit. The form and the vials containing the swab samples were placed in a

sealed envelope. (Compl. ¶ 20). The gunshot residue evidence, along with the other evidence from the investigation, was given a single complaint number and stored in a secured evidence locker at the Genesee Township Police Department. (Compl. ¶ 21).

Shortly after gathering the gunshot residue, in the early morning hours of August 23, Defendant ordered Newman to be transported to Genesee County Jail to be held for the murder of Bradshaw. (Compl. ¶ 22).

On August 23, Newman obtained legal counsel. On August 24, Newman's counsel contacted Defendant and informed him that Newman wished to make another statement. (Compl. ¶ 23). On the afternoon of August 24, Defendant, Detective Williams, Newman, and Newman's counsel met in Genesee County Jail. Newman again was given his Miranda warnings and stated that he wished to be interviewed with his counsel present. (Compl. ¶ 24). The ensuing taped interview lasted approximately twelve minutes. (Compl. ¶ 25).

During the interview, Newman accused his uncle, Plaintiff Haywood Johnson, of murdering Bradshaw. (Compl. ¶ 26). According to Newman, Plaintiff believed that Bradshaw was involved in the murder of Plaintiff's son, three years earlier. (Compl. ¶ 27). Plaintiff alleges that based upon this twelve-minute statement, Defendant ordered Newman released from jail. (Compl. ¶ 28).

On and after August 22, Defendant directed his police officers to canvas the neighborhood around the 1090 East Juliah residence, but they were unable to find any witnesses. (Compl. ¶ 29).

On or about September 1, 2004, Defendant went to the Genesee County Prosecutor's Office with a police report and circuit court history to seek a warrant for the arrest of Plaintiff.

4

(Compl. ¶ 30). At that time, Defendant had not submitted the gunshot residue swabs for analysis. (Compl. ¶ 31). Plaintiff alleges that the only evidence in the report against him was Newman's statement. The report further did not mention that Defendant had secured the gun residue samples from Newman. (Compl. ¶ 32).

The Genesee County Prosecutor applied for an arrest warrant, and the district court judge authorized the warrant on September 1, 2004. (Compl. ¶ 33).

Upon securing the warrant, the police arrested Plaintiff at his residence. (Compl. ¶ 34). Upon Plaintiff's arrest, Plaintiff's wife consented to a search of the residence. During the course of the search, the police found some ammunition for a .38 caliber gun and an empty box for a .44 caliber Rossi revolver. (Compl. ¶ 35). The police also located two additional firearms under Plaintiff's bed; a sawed-off shotgun, and a pistol with an obliterated serial number.

On September 14, 2004, Defendant testified at Johnson's preliminary examination in state court. At that time, it was unknown what caliber gun had been used to kill Bradshaw. (Compl. ¶ 36). During that testimony, Defendant did not disclose that he personally had obtained the gunshot residue evidence from Newman. (Compl. ¶ 37). Based on the testimony of Newman and Defendant, Plaintiff was bound over at a preliminary examination on charges of open murder and felony firearm. (Compl. ¶ 38). ). Plaintiff's counsel, the same attorney as in the instant case, agreed with the bind over, stating, "I understand that there's gonna be sufficient probable cause to bind this case over, but given the weakness of the – of the evidence that's come in so far, I'd ask the Court to give serious consideration to reducing bond in this case." (Preliminary Examination 103).

As a result of the bind over in district court, Plaintiff was arraigned in Genesee County Circuit Court on these charges. After the original arraignment, the prosecutor added an additional count of carrying a concealed weapon. (Compl. ¶ 39). After the arraignment, the autopsy report for Bradshaw revealed that he had been killed by a bullet from a .44 caliber gun. (Compl. ¶ 42).

Before trial, Plaintiff's attorney spoke with the prosecutor assigned to the case and also the Defendant about evidence and assistance in locating possible witnesses. (Compl. ¶ 40). Plaintiff's attorney made discovery requests, including any exculpatory evidence, police reports, copies of notes for individuals interviewed in the case, and "copies of all testing requests made by law enforcement personnel." (Compl. ¶ 61). Defendant had not made any testing requests. Prior to the trial date of February 1, 2005, Defendant did not supplement his police report or advise Plaintiff's counsel that he had had the gunshot residue evidence. (Compl. ¶ 41).

The case went to trial in Genesee County Circuit Court from February 1 to 3, 2005. (Compl. ¶ 44). Neither Defendant nor the prosecutor revealed to Plaintiff's counsel during the trial the existence of the gunshot residue swabs. (Compl. ¶ 45). The jury was unable to reach a verdict, and a mistrial was declared. (Compl. ¶ 46).

During that first trial, Randall J. Petrides, the assistant prosecuting attorney, as he was preparing Newman for cross-examination, became aware of the existence of the gunshot residue samples that had been taken from Newman. (Def. Br. Ex. D, Petrides Dep. 9). Newman had mentioned that the police had "checked [his] hands." (*Id*.). Petrides testified that he interpreted that statement to mean that the police administered a "gloving" test. (*Id*. at 10). Petrides also stated that he was not presented with any documentation about such a sampling having occurred.

(*Id*. at 12). Petrides did not inform Plaintiff's attorney that he was aware of the existence of the gunshot residue swabs.

The second criminal trial was scheduled for March 29, 2005. (Compl. ¶ 47). The case was assigned to a different prosecuting attorney, Janet McLaren. (Compl. ¶ 48). Petrides informed McLaren of the existence of the gunshot residue swabs. (Petrides Dep. 11).

On or about March 11, 2005, McLaren informed Plaintiff's attorney that she had discovered the existence of the gun swab residue swabs. The prosecutor sent the samples to a laboratory in Pennsylvania for analysis. (Compl. ¶ 49).

The test results were inconclusive as to whether Newman fired a weapon, but did establish that the residue on his hands was characteristic of gunshot residue. (Compl. ¶ 50). The prosecutor refused to dismiss the charges against Plaintiff, and the second trial proceeded on the charges of murder, felony firearm, and carrying a concealed weapon on March 29, 2005. (Compl. ¶¶ 51-52).

At the second trial, evidence of the gunshot residue test results was admitted. (Compl. ¶ 53). The jury returned a "not guilty" verdict. (Compl. ¶ 54).

During the second trial, Defendant was questioned about the gunshot residue samples. Defendant testified that he did not send the samples for testing because Newman was not a suspect at that time and that the police knew that Newman had been in contact with the .22 rifle. (Def. Br. Ex. F, Second Trial Transcript 44). Defendant further testified that he did not "intentionally" make the decision not to disclose the fact of the residue testing on his investigative report. (*Id*. at 46).

At his deposition, Defendant explained that gunshot residue sample tests tended to reveal if an individual fired a gun, handled a gun, or had been close to a gun. (Def. Br. Ex. E, Scheidler Dep. 26, 46). Defendant emphasized that fact that he knew that Newman had handled a .22 rifle on the day of the murder. (*Id*. at 37, 48-50, 52-53). Defendant further stated that he found Newman's version of Plaintiff's role in the murder to be clear and credible. (*Id*. at 71-72).

On April 20, 2005, Plaintiff was charged in federal court with a three-count indictment – possession of a firearm with an obliterated serial number, possession of a sawed-off shotgun, and felon-in-possession of a firearm – based upon the two guns found under Plaintiff's bed during the murder case arrest. Plaintiff was arrested on the federal charges on April 21, 2005, and posted bond the same day.

On May 31, 2005, Plaintiff filed a motion to quash the federal indictment, based upon a lack of probable cause to arrest Plaintiff for open murder in the Genesee County court action. The federal district court initially held a hearing on September 1, 2005. The court then held an evidentiary hearing on September 23, 2005, to determine whether Defendant had probable cause to arrest Plaintiff at the time of his state arrest warrant request. The court held a subsequent hearing on October 27, 2005, on the issue of whether Defendant or his wife consented to the search of their residence; and it was determined that her consent was valid. The federal district court ruled that Defendant had probable cause to arrest Plaintiff. *See* Opinion and Order, *United States v. Johnson*, No. 05-50027 (E.D. Mich. Dec. 2, 2005).

Judge Gadola held that Detective Scheidler had established probable cause to arrest Johnson:

First, Newman and Bradshaw were friends from childhood and the dispute involved a

8

> small amount of drugs and money. . . . Second, Hardnett's statement clearly expressed that Newman had not committed a wrong himself, but that he had witnessed one. Fear of accomplice liability, or a possible reluctance to accuse his uncle, may explain his first denial. Third, Newman's second statement was made in the presence of, and after having consulted with, counsel. The two days Newman spent in jail could have convinced him not to take the blame for something he had not done, just as easily as it could have convinced him to falsely place the blame on someone else. Fourth, Newman owned a small caliber rifle, not a large caliber pistol as was used to kill Bradshaw. Further it would be foolish for Newman to assassinate Bradshaw in his own residence after witnesses had seen him accompany Bradshaw there. Fifth, Defendant was at Newman's residence for a brief while, only long enough to commit the murder, which explains why no other witness placed Defendant at the scene. Finally, multiple witnesses corroborated Defendant's motive for killing Bradshaw.
>
> The Court finds that Newman's second statement was sufficiently trustworthy and that the totality of the circumstances adequately corroborated it so as to constitute probable cause to arrest Defendant.

*Id*. slip op. at 8-9.

Thus, Plaintiff has received an adverse Federal Court ruling on his argument that the Government, through Scheidler's investigation, did not have probable cause to arrest him for Bradshaw's murder.

While Plaintiff's federal motion to quash was still pending, Plaintiffs filed the instant five-count civil Complaint in this Court, on November 22, 2005, asserting:

    Count I:     42 U.S.C. § 1983: Deprivation of Due Process
    Count II:    Malicious Prosecution (state law)
    Count III:   Intentional Infliction of Emotional Harm and Upset (state law)
    Count IV:    Gross Negligence (state law)
    Count V:     Loss of Consortium (state law).

Plaintiff essentially asserts that Defendant should have disclosed the existence of gun residue swabs' existence and had that evidence tested, before proceeding with the warrant and first trial against Plaintiff. Furthermore, Plaintiff alleges that the failure to disclose and to test the evidence amounted to "withholding exculpatory evidence" from his defense in the criminal

9

matter, and deprived him of his federal constitutional rights. Plaintiff claims that as a result of this non-disclosure, he suffered arrest, incarceration, money paid to a bondsman, attorney's fees, and extreme emotional harm and upset. (Compl. ¶¶ 69, 77, 86).

On December 2, 2005, the federal district court in Plaintiff's criminal case concluded that Defendant had adequate probable cause to request an arrest warrant for Plaintiff on the murder charge. The district court, however, did not rule on Plaintiff's gunshot residue swab disclosure argument. Plaintiff did not file a motion for reconsideration on this issue.

On February 16, 2006, Plaintiff and the federal government entered into a Rule 11 plea agreement in the criminal proceeding. Plaintiff agreed to plead guilty to the felon-in-possession charge, and the Government would dismiss the other two federal weapons charges. The Rule 11 agreement also provided that Plaintiff waived his appeal rights to his conviction or sentence if the court sentenced him to less than forty-one (41) months.

On June 9, 2006, the court accepted the Rule 11 Agreement and sentenced Plaintiff to two years of probation. The Government subsequently appealed the sentence on July 12, 2006, arguing that the sentence was unreasonable. As of the date of the instant Opinion, the appeal for Plaintiff's criminal case remains under consideration by the United States Court of Appeals for the Sixth Circuit. *See United States v. Haywood*, No. 06-1999 (6th Cir. oral argument requested Jan. 16, 2007).

On February 12, 2007, Defendant moved for dismissal or for summary judgment in the instant case on all of Plaintiff's claims, in part based upon qualified immunity.

II. ANALYSIS

    A. **Standard for Summary Judgment**

Pursuant to Federal Rule of Civil Procedure 56(b), a party against whom a claim, counterclaim, or cross-claim is asserted may "at any time, move with or without supporting affidavits, for a summary judgment in the party's favor as to all or any part thereof." Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact as to the existence of an essential element of the nonmoving party's case on which the nonmoving party would bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A fact is "material" for purposes of a motion for summary judgment where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Conversely, where a reasonable jury could not find for the nonmoving party, there is no genuine issue of material fact for trial. *Id.*. In making this evaluation, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party. *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-11 (6th Cir. 1984).

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial" will mandate the entry of summary judgment. *Celotex*, 477 U.S. at 322-23. The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial.

FED. R. CIV. P. 56(e). The rule requires that non-moving party to introduce "evidence of evidentiary quality" demonstrating the existence of a material fact. *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997); *see Anderson*, 477 U.S. at 252 (holding that the non-moving party must produce more than a scintilla of evidence to survive summary judgment). "'[C]onclusory' allegations unsupported by 'specific' evidence will be insufficient to establish a genuine issue of fact." *Id.* (citations omitted); *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 902 (1990).

  B.  **Federal Title 42 U.S.C. § Section 1983 Due Process Claim & Qualified Immunity**

The Court concludes that two alternative grounds support dismissing Plaintiff's federal § 1983 due process claim. First, a party cannot maintain a § 1983 due process claim under *Brady* if the party was never convicted – indeed was acquitted of the state criminal charges. Second, Plaintiff failed to sue Petrides, the prosecutor in the first state criminal trial, the proper defendant in his Brady claim.[1] Petrides learned mid-trial that Newman had been subjected to a firearm

---

[1] Since the Court provides two alternative reasons for the dismissal of Plaintiff's federal § 1983 due process claim, it need not reach the question of whether the gunshot residue evidence as to Newman was, in fact, exculpatory evidence, as recognized by *Brady*.
  The Court notes that the following results from the SEM Analysis of Gunshot Residue Samples on March 26, 2006:

> There were no particles unique to GSR on the hand samples of Martin Daron Newman samples...

(Pl. Br. Ex. 6, p. 4).
  Similarly, the following result was set forth in the SEM Analysis of Gunshot Residue samples on March 21, 2005:

> Conclusions
>
> There were no particles classified as unique to gunshot residue found on

residue swabbing by Defendant Scheidler, and did not communicate that fact to opposing counsel.

        1.        Qualified Immunity

The United States Court of Appeals for the Sixth Circuit recently summarized the qualified immunity analysis:

> Through the use of qualified immunity, the law shield "governmental officials performing discretionary functions. . . . from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." The Supreme Court instructs lower courts to perform a two-tiered inquiry to determine whether a defendant is entitled to qualified immunity. Courts should first determine whether "the facts alleged show the officer's conduct violated a constitutional right[.]" If the plaintiff establishes that a constitutional violation occurred, a court must next consider "whether the right was clearly established." When a defendant raises a defense of qualified immunity, the plaintiff bears the burden of demonstrating that the defendant is not entitled to qualified immunity.

*Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397, 403 (6th Cir. 2007) (internal citations omitted).

In regards to the first prong of the qualified immunity analysis, the Court must find that Plaintiff alleges a constitutional violation. Plaintiff argues that the failure to disclose to the prosecutor and Plaintiff's counsel the gun residue swabs evidence violates the constitutional requirement spelled out in *Brady v. Maryland*, 373 U.S. 83, 87 (1963) ("[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of

---

> NEWMAN Right Back, Right Palm, Left Back and Left Palm. . . . These results of the analysis of these samples must be termed inconclusive. These results do not eliminate the possibility that the subject may have handled or discharged a weapon.

(*Id*. at 6).

the prosecution"); *Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987). There exists no difference between exculpatory and impeachment evidence for the purposes of *Brady*. *Kyles v. Whitley*, 514 U.S. 419, 433 (1995). *Brady* suppression can occur when the government fails to turn over evidence that is "known only to police investigators and not to the prosecutor." *Id*. at 438. The "materiality" requirement inquires into whether "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Strickler v. Greene*, 527 U.S. 263, 280 (1999). The Sixth Circuit has recognized that "[t]here is no *Brady* violation where a defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory information, or where the evidence is available from another source." *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1999) (citations and internal quotations omitted). In the instant case, there is no allegation that Plaintiff was aware of the gun residue swab, or that the evidence was available from another source.

An initial question that the Court must confront is whether Plaintiff can maintain a § 1983 due process action, premised on a *Brady* violation, against a police officer even though Plaintiff was never convicted – first trial, a hung jury, and second trial, acquitted on the criminal charges. Plaintiff bases his claim upon the conjecture that but for the non-disclosure of the gunshot residue evidence, the first criminal trial would have resulted in "not guilty," rather than a "hung jury."

Under Michigan law, "[t]he general view of a hung jury mistrial has been that it is essentially a nullity and that the subsequent retrial determines a defendant's guilt or innocence." *People v. Thompson*, 424 Mich. 118, 135 (1985). In this instance, Plaintiff's second criminal trial resulted in a verdict of acquittal, so this was the only outcome of his criminal case.

The Sixth Circuit has held that when "the underlying criminal proceedings terminate in [the plaintiff's] favor, he has not been injured by the act of wrongful suppression of exculpatory evidence." *McCune v. City of Grand Rapids*, 842 F.2d 903, 907 (6th Cir. 1988); *Lindsay v. Bogle*, 92 Fed. Appx. 165, 170 (6th Cir. Feb. 3, 2004) (unpublished). The Sixth Circuit further suggested that although an acquittal forecloses a subsequent due process claim, a wrongful suppression of evidence could be relevant to other claims, such as malicious prosecution. *McCune*, 842 F.2d at 907.

Here, under Michigan law, the only outcome of Plaintiff's criminal case was an acquittal. The "hung jury" result in Plaintiff's first criminal case was not a "verdict" for the purposes of establishing a *Brady* claim. *See Thompson*, 424 Mich. at 135; *Strickler*, 527 U.S. at 281 (holding that to establish a *Brady* violation a party must establish that the suppressed evidence would have produced a *different* verdict). Therefore, since Plaintiff's allegations, as a matter of law, cannot establish a violation of the due process right to a fair trial, Plaintiff cannot establish the first prong of the qualified immunity analysis. Accordingly, the Court dismisses Plaintiff's § 1983 claim on this ground.

2.  Prosecutorial Duty to Disclose *Brady* Evidence

As an alternative ground for summary judgment, the Court finds that once Petrides, the prosecuting attorney in Plaintiff's first state criminal trial, discovered the existence of the gunshot residue evidence, mid-trial, assuming there was a disclosure obligation, it was his responsibility, and not Defendant's, to disclose the evidence to Plaintiff.

Under *Brady*, the prosecutor has the ultimate responsibility to turn over exculpatory evidence to the defense. *Kyles*, 514 U.S. at 437. The prosecutor not only has a duty to disclose

any known exculpatory evidence, but also "has a duty to learn of any favorable evidence known to the others acting on the government's behalf in t[he] case, including the police." *Id.*; *Harbison v. Bell*, 408 F.3d 823, 840 (6th Cir. 2005). Police officers can be liable for *Brady* violations when the exculpatory evidence is "known only to police investigators and not to the prosecutor." *Kyles*, 514 U.S. at 438.

In the instant case, Defendant informed Petrides, at some point during the presentation of Plaintiff's case-in-chief in the first criminal trial, of the existence of the gunshot residue evidence. Petrides testified:

> Q: All right. And at some point do you become aware that gunshot residue samples were collected from Darin Martin Newman?
>
> A: Yes.
>
> Q: And number one, how did you learn that?
>
> A: It was an established process. I ultimately knew in between the two trials when Janet McLaren verified that the police had taken samples. But the reason that Janet was able to check to see the verification is I told her that in the middle of trial I had heard a passing comment that that might have happened.
>
> Q: Where did you hear that passing comment?
>
> A: From Mr. Newman.
>
> Q: Can you tell me what it is that you heard, the circumstances under which you heard it?
>
> A: Yes, It was after he had – it was probable day three, give or take, after he had already gone through direct exam. Up to this point, I was clueless, had no idea there was anything out there, before trial, in any pretrial interviews, anything like that, even through voir dire, opening, direct examination of Mr. Newman, and whoever else may have testified up to that point.
> When he came back the second day I was down in the hallway . . . . looking for witnesses . . . . [a]nd I found [Newman]. And we started to walk up toward court. And I had mentioned a couple of possible lines of cross-examination that

>   [Plaintiff's attorney] might approach him with, and mentioned that [Plaintiff's attorney] might perhaps explore whether or not he could have been the one who did this as opposed to the defendant. And [Newman] mentioned in passing that had – they had checked my hands, you can tell it wouldn't have been me, they checked my hands. That's the first I heard of it.
>
> . . . .
>
> Q:  When he said, they checked my hands, in your own mind, did you have any idea what he was talking about?
>
> A:  I think I knew he was referring to a test the police sometimes do – sometimes called gloving, there's several terms for it, where a kit is used. It's something that's been more common in recent years than in past years. But I knew what he was referring to.
>
> Q:  After [Newman] made that comment to you, at any time prior to the time the case was reassigned to Janet McLaren, did you ever ask Curt Scheidler about it?
>
> A:  No, I didn't even remember the comment. It was – again, that was – this is before all that we learned afterwards. This is just, they checked my hands, and three or four seconds, and then we're off into other things in the hallway. So, no, I didn't talk to Curt Scheidler about it.

(Petrides Dep. 8:10-25; 9:1-25; 10:10-25, 11:1-3).

Defendant testified that he did not include the fact of the gunshot residue sampling in his police report, and could not remember if he ever discussed the issue with Petrides. (Scheidler Dep. 52-56). Scheidler did not consider the evidence significant since Newman possessed a .22 caliber rifle, had contact with that rifle the day before the murder, the victim had been killed by a .44 caliber firearm, and Plaintiff Johnson had a box for a .44 caliber firearm and had a motive (his son's murder). Petrides testified that he did not discuss the gunshot residue swab samples with Scheidler at any point during the first trial after learning about them from Newman, or in-between the two trials. (Petrides Dep. 12:23-35, 13:1-9).

Upon learning of the fact of the test from Newman, the gunshot residue evidence testing was no longer "only known" to police. Under *Kyles,* Petrides, with knowledge of this evidence,

had the sole duty to disclose its existence to Plaintiff. 514 U.S. at 437. Indeed, Petrides testified that both McLaren and he, after discussing the gunshot residue samples in between the two trials, considered it "automatic" to disclose the existence of the test samples to Plaintiff. (Dep. Petrides 12:12-22). In addition, Petrides had a duty to learn of "any favorable evidence known to others" in the course of prosecuting the case against Plaintiff. *Kyles*, 514 U.S. at 437.

Thus, since the prosecuting attorney bears the ultimate responsibility for disclosing exculpatory evidence to a criminal defendant when that evidence is known to the prosecutor, Plaintiff in this instant case cannot maintain a § 1983 due process claim, based on a *Brady* violation, against Defendant police officer. Accordingly, the Court concludes it must dismiss Plaintiff's federal § 1983 claim on this alternative ground.

### C.     State Law Claims

Plaintiff's federal claim has been dismissed. While the Court possesses the discretion to exercise jurisdiction over Plaintiffs' state law claims, it will decline to exercise that jurisdiction pursuant to 28 U.S.C. § 1367(a) and (c). Considerations of judicial economy do not support further proceedings to resolve purely state law clams. *See Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006); *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966). Accordingly, the Court DISMISSES WITHOUT PREJUDICE the remaining state law claims of malicious prosecution, intentional infliction of emotional distress, gross negligence, and loss of consortium.

## III.    CONCLUSION

For the foregoing reasons, the Court hereby:

(1) **GRANTS** Defendant's Motion to Dismiss Plaintiff's federal § 1983 due process claim; and

(2) **DISMISSES WITHOUT PREJUDICE** Plaintiff's state law claims.

**SO ORDERED**.

s/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated: April 16, 2007

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on April 16, 2007.

s/Denise Goodine
Case Manager